Filed 4/24/15  In re V G. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re V.G. et al., Persons Coming Under the Juvenile Court Law. | B257432 (Los Angeles County Super. Ct. No. CK92412) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>E.L.,<br><br>        Defendant and Appellant;<br><br>VICTORIA P.,<br><br>        Appellant. | |

APPEALS from a judgment of the Superior Court of Los Angeles County. Philip Soto, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant E.L.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Appellant Victoria P.

Arezoo Pichvai, Tarkian & Associates for Plaintiff and Respondent.

E.L. (Mother) has a history of untreated mental illness. In 2012, her children were detained. Her infant and toddler bonded for over two years with a prospective adoptive family. Mother's visits were always monitored. Shortly before the permanent plan hearing, Mother began using antipsychotic medications. Mother's recent effort does not outweigh the children's need for permanency. We affirm orders denying further reunification services and terminating parental rights. (Welf. & Inst. Code, §§ 388, 366.26.)[1] The legislative preference for adoption is not overcome by either the parent-child bond or the sibling relationship statutory exceptions.

## FACTS

Mother's children are Victoria P. (born in 1996), V.G. (2010) and O.L. (2011). In February 2012, Mother was committed to a psychiatric hospital.[2] A physician stated that Mother is psychotic and has "outbursts," yelling that "her arm is on fire, her vagina hurts, and she's being drowned." Mother believes that the FBI planted a chip in her to monitor her movements and deny her government assistance; she wanders away for days at a time, and no one knows where she has been; she sleeps in the bushes outside her home; and she refuses to enroll in a mental health program.

Teenage Victoria informed the Department of Children and Family Services (DCFS) that Mother's behavior was worsening: her irrational outbursts used to happen twice a day, "but now it's every 10 minutes." Mother felt she must pick up garbage to save other people's lives. Victoria recalled that Mother once took medication for bipolar disorder and depression, but stopped because she disliked the side effects. Victoria hoped that Mother will get help. The children of Mother's housemate described Mother as "crazy" and "very strange and bizarre." O.L. and V.G. were too young to be interviewed.

---

[1]   All statutory references in this opinion are to the Welfare and Institutions Code.

[2]   In 2010, Mother was involuntarily detained when she tried to leave the hospital while giving birth. Victoria and V.G. were in protective care for nine days.

DCFS detained the children on March 1, 2012, and placed them as a sibling set. One month later, Victoria was moved after the foster mother twice found drug paraphernalia. In April 2012, V.G. and O.L. were declared a sibling group, and Victoria was excluded.

Mother was relieved that DCFS took the children into protective custody, because "now I know they are safe." She denied saying crazy things, yelling, hearing voices, or believing that the FBI was out to get her, and described herself as "very lucid." Mother reported that she is quoting from the Bible and talking to God when she speaks aloud, and that she may have a pelvic or urinary infection that caused her to yell about her private parts. Mother also suggested that she yells because she goes barefoot and steps on glass, or the neighbors annoy her. She collects trash to reduce litter and recycle.

On March 6, 2012, DCFS filed a petition alleging that Mother has a history of mental and emotional problems, was hospitalized for evaluation and treatment, cannot provide regular care for the children, and her condition endangers the children's health and safety. She denied the allegations. The court found a prima facie case for detaining the children. Mother was authorized to have monitored visits.

Victoria confirmed that Mother says bizarre things, yells, goes on "missions" to cool down, and does not contact her family for days. Mother has had three prior psychiatric hospitalizations, and ignored Victoria's requests that she take medication. Victoria's father Shane P. told DCFS that "Things got too weird with [Mother] and I asked her to leave. She never got any help," though he begged her to do so. Mother's housemate said that Mother leaves "for days on end with no call and no check in."

An amended petition alleges that Mother's mental problems include a diagnosis of bipolar disorder, auditory hallucinations, and paranoid, delusional and psychotic behavior. Mother has not taken psychotropic medication and was involuntarily hospitalized for treatment, which renders her incapable of caring for the children and places them at risk of harm. A new count alleges that Victoria's father has a history of substance abuse and a conviction for drug possession.

3

Mother denied being diagnosed with any condition or prescribed medication, or having hallucinations, or being hospitalized. She has been an exotic dancer for decades and performs in adult films. Shane P. had custody of Victoria from 2001 to 2006. The fathers of V.G. and O.L. have never seen their children. Mother is homeless: she sleeps at the dance club where she works or on a bus.

In May 2012, Mother informed DCFS that she did not plan to "fight" for the children and "they could find her when they turn 18." Mother did not visit the children at all. DCFS contacted 52 foster homes or agencies, trying unsuccessfully to place the three children in one home. They had regular sibling visits. Victoria was placed in a group home after her second foster family discovered that she sneaked an older male into her bedroom. Mother saw Victoria during a meeting at DCFS and upset the child by saying, "I would rather be in Panama on a yacht right now than in this visit with you" and suggested to Victoria that the foster home "can take care of you. I am not going to spend the next 18 years trying to get my kids back, get over it already." The visit was terminated and Mother continued to rant at Victoria as they left the office.

The court sustained the allegations against Mother and Shane P. at the jurisdiction hearing on June 21, 2012, and declared the children to be dependents of the court. Mother was ordered to attend individual counseling with a licensed therapist and take prescribed psychotropic medications. She was given monitored visits.

Victoria fled foster placement for months at a time between July and December 2012, calling the social worker to say that she was in Nevada. In October 2012, Victoria entered a foster home, but was ejected for sneaking a boy into her bedroom and drinking alcohol. She ran away from her new foster home. V.G. and O.L. were thriving since April with caregivers who have an approved adoptive home study and wish to adopt them. V.G. was seeing a therapist weekly, and had stopped biting herself.

Though entitled to three visits per week, Mother did not call DCFS to request visits for nine months. She finally saw V.G. and O.L. for one hour at the end of November 2012. During her visit, the children referred to the foster parents as "mommy" and "daddy." Victoria and Mother speak by telephone and see each other in unmonitored

4

visits, in violation of court order. Victoria had six visits with her half siblings between March and November 2012, and they interacted well.

A caregiver demanded Victoria's removal in January 2013, because she was a bad influence on other children in the home, running away and reportedly having oral sex with a boy. Victoria was "AWOL" from January to March 2013. She denied living with Mother, but they came to the DCFS office together for monitored visits with the younger children. V.G. and O.L. are "very attached to their foster parents and recognize them as their only caregivers."

Mother continues to work as an adult entertainer but lacks money to meet her basic needs. She does not believe she needs therapy or prescribed medication because she is not "schizo." Mother yelled at the social worker that she does not want visits with any of the children, she just wants them in her care. She believed that the only impediment to gaining custody was finding a home. She was sleeping on the floor in a "bachelor pad" with two men, one of whom has an open DCFS case.

Mother saw the children four times in February 2013. Mother's psychiatrist wrote that Mother has bipolar disorder with psychotic features; chronic paranoid schizophrenia; alcohol dependence; auditory hallucinations and delusions and believes that she is micro-chipped by the FBI, CIA and other government agencies. She told the doctor that parasites are coming out of her nose. Mother frequently fails to show up for her counseling appointments, and wanted Victoria to be forcibly locked in a facility.

In March 2013, the court found Mother is in partial compliance with the case plan and released Victoria to Mother's care, under DCFS supervision. In May 2013, the court removed Victoria from Mother's care after DCFS reported that they were living in a virtually empty house with no bedding and neighbors witnessed drinking or substance abuse. On an unannounced visit, the social worker smelled marijuana where Victoria was sitting. When DCFS executed the warrant for removal, Mother yelled, made inappropriate comments and the police were called. The following day, Mother was aggressive and threatening at the DCFS office.

5

DCFS filed a new petition for Victoria, who was three months pregnant, and the court ordered her detention. Mother admittedly allowed Victoria's boyfriend to stay overnight with Victoria while the child was AWOL from her foster placements. Mother does not know how to set boundaries. Mother indicated that she did not want any visits with Victoria or to reunify with her. When upset, Mother tended to yell that she no longer wished to visit, but would then apologize and ask to have visits. The court sustained the petition, and Mother was given monitored visits.

In June and August 2013, DCFS reported that V.G. and O.L. are strongly bonded to the foster parents, who are very involved in the children's lives and provide appropriate care and supervision. Mother had monitored visits twice a week since March 2013, and behaved well with the children; however, she screamed at the social worker, "adopt them out, this is crap" and stormed from the office, slamming the door. She stopped taking her medication because she felt she did not need it. She is homeless.

Mother describes herself as a "supermom" and has no insight into her problems. She refuses to participate in any programs and takes no responsibility for her actions. She yelled obscenities and slurs at the social worker and displayed paranoia during a monitored visit, accusing DCFS and the caregivers of being part of an ethnic mob who are bugging the DCFS visitation rooms and are out to get her. She was ejected from the courtroom after disrupting a hearing.

Mother received referrals for shelter, housing and a food pantry, but continued to be homeless in September 2013. She did not take medication. She attended counseling sessions between October 2012 and August 2013: her current psychiatrist diagnosed a bipolar affective disorder with psychotic features. Mother told the social worker that she would not be returning for counseling because "human trafficking" was occurring in the mental health facility lobby. When other facilities were recommended, Mother replied that she is not "crazy." V.G. and O.L. appear happy and well-adjusted, and do not display any behavioral or emotional issues. They are thriving with their caregivers. Eighteen months had passed since the children were detained, but Mother continued to

deny having mental health problems. Victoria's caregiver asked that she be removed: DCFS then had difficulty finding a new home for a pregnant teen.

On September 11, 2013, the court terminated Mother's reunification services with O.L. and V.G. It found that reasonable services were provided, and set a permanent plan hearing. Mother was allowed to have monitored visits once a week. Victoria sought to contest the permanent plan, arguing that she has maintained visitation during the case and has a sibling relationship. She acknowledged that there is a postadoption contract to ensure continued contact with O.L. and V.G. The caregivers expressed willingness to maintain Victoria's sibling relationship, with personal visits, telephone calls, or Skype. Victoria stopped visiting after giving birth in November 2013.

Victoria had unmonitored visits with Mother, and purchased a car for Mother's use. Victoria wanted her siblings to move to her latest foster home: she did not understand that she has a very unstable placement history or that her siblings have been in a permanent home for over a year. She disappears regularly, does not contact her caregivers, and refused to attend a prenatal appointment to test for diabetes.

Mother made completely irrational statements to the social worker. She had monitored visits once a week at the DCFS office and was given referrals for housing and for counseling, but did not participate in therapy or take medication. DCFS asked the court to terminate Mother's reunification services with Victoria, reasoning that Victoria and her baby need stability and permanency. The court terminated Mother's reunification services with Victoria on January 6, 2014, and authorized them to have monitored visits. Victoria was 17 years old.

For the permanent plan hearing, DCFS reported that V.G. and O.L. are happy, thriving and strongly bonded with the M. family, who ensure sibling visits with Victoria. Mrs. M. is a stay-at-home mother for the children, who are not of school age; Mr. M. is employed in the financial industry. They are committed to providing a loving, stable, permanent home for the children.

Though Mother visited fairly consistently, the children are not bonded to her. For example, in December 2012, V.G. wanted to remain near Mrs. M., and continued call the

foster mother "mother" even after Mother told her not to do so. In February 2013, Mother cancelled a visit at the last minute, and V.G. said, "that's ok." She is not sad when Mother cancels visits. O.L. enjoys visits because he gets to play with toys and watch movies, but "he did not appear to be excited when he saw his mother." O.L. is cooperative and happy, but frequently states that he wants to see his foster mother before, during and after visits with Mother.

Mother's behavior is often bizarre. In August and September 2013, Mother inappropriately asked the visitation monitor whether she was raped as a child; made paranoid statements; was verbally aggressive; yelled "get out of [my] face" at V.G.; stared out the window during most of a visit; asked other visitors about their "human trafficking" activities; and asked the monitor if she was going to kill the children. When Mother went outside to smoke, the children did not notice her absence and did not respond when she returned to say goodbye. By October 2013, both children became upset in the parking lot on the way to the visit and cried at the beginning of the visit. When Mother asked V.G. what was wrong, the child said she wanted to be home with the foster mother. O.L. sought to be held by the monitor when he first saw Mother.

On October 25, 2013, Mother acted inappropriately during a visit. She suggested that DCFS was being investigated for child trafficking and was watching every move she makes. When DCFS staff tried to terminate the visit, Mother began swearing and was escorted out. A staffer thought that Mother was having a psychotic episode. She was screaming and swore loudly at the DCFS security guard, saying he was a "child molester" who was "responsible for child trafficking." She scared other people in the lobby, and caused V.G. and Victoria to cry. Once outside the facility, Mother sat on a bench "talking to herself and acting very crazy." The children stopped crying once Mother departed. Victoria denied that Mother's behavior is unusual, aggressive or inappropriate, tuning out when Mother shouts bizarre comments or obscenities. DCFS sought to limit Mother's visits to once a month, at a police station.

In November 2013, Mother told the social worker that the foster home is affiliated with the Armenian mafia, that the visiting rooms at DCFS are "bugged," that she "wants

8

the chip out of her arm;" and that the children are cloned. V.G. was negatively impacted by visits. She cried, said that she wanted to go home with the foster mother, and did not want to go inside for a visit with Mother. She tried to run away from Mother and back to the departing foster mother, saying, "I want Mommy." Mother responded, "I'm your mommy. Why are you upset?" then asked the child whether the monitor "put a penis in your face?" When informed that it is inappropriate to make sexual comments to the children, Mother began yelling in the monitor's face and V.G. began to cry loudly. Mother entered the DCFS lobby and yelled at staffers in a "very escalated" manner. The visit was terminated. One week later, V.G. repeatedly stated that she did not want to talk to Mother and demanded that Mother be quiet when she tried to engage the child. After the visit, the children needed to be transported to their foster home, but V.G. cried and screamed that she wanted the foster mother. She bit the social worker, who was putting in her car seat, and cried for the 40-minute ride home. Afterward, she had uncontrollable tantrums for a week. Subsequently, the foster mother transported the children to and from visits to ease the transition.

In a January 2014 report for the permanent plan hearing, DCFS reviewed Mother's lengthy history of untreated mental illness. Mother did not visit the children for nearly nine months after they were detained. Initially, she appeared to make progress, but by September 2013, her behavior became aggressive and inappropriate, and negatively impacted V.G.'s emotional well-being. There is no parent-child relationship: V.G. refers to the caregiver as "mommy" in Mother's presence and neither child seeks Mother's attention or affection during visits. Mother failed to comply with court orders to address her mental issues and rejects any need for medication. The children are doing well and are very attached to the foster family. V.G. told the social worker that "she likes living with her mommy and daddy," referring to the foster parents.

Victoria was moved to a new placement in February 2014, after she left foster care without permission. She opposed the adoption of her siblings, noting that she lived with V.G. and O.L. from their births until they were detained. During that time, she maintained a "parental role" in Mother's absence, feeding them, changing their diapers,

9

and ensuring their safety. One month after detention, Victoria was separated from her siblings, but has consistently visited them, even while pregnant and now with her infant daughter, spending hours on public transportation to reach them. They are happy together. Victoria acknowledged the willingness of the prospective adoptive parents to allow sibling visits, but their contract only calls for two visits per month instead of the four visits authorized by current court order. She hopes to become their guardian when she turns 18 in October 2014.

Victoria requested a modification to have unmonitored visits with Mother, who just started using prescription medications to stabilize her moods. They are very bonded. She is in foster care but wishes to reside with Mother when she turns 18. DCFS opposed a change because it is unclear whether Mother takes her medications and Victoria lacks insight into and minimizes Mother's mental health issues. DCFS received referrals that Victoria neglected her four-month-old infant Eli by leaving her at the foster home and not returning until the following day. Victoria admitted to smoking marijuana while breastfeeding, and was arrested for tagging graffiti at a train station while an adult male held Eli and acted as a lookout. Victoria was intoxicated and had beer in her possession when arrested. Victoria was placed in a home for at-risk teen mothers, and was able to visit her infant and siblings. The court denied Victoria's request for a modification.

In May and June 2014, Mother requested a modification to reinstate family reunification services, indicating that she is "a good mom" and has a place for the children to live. She was using prescribed medications and felt emotionally and mentally stable. She was ejected from three or four shelters, which is how she became homeless for a long period. Mother opined that the children are unhappy in their placement. Mother shares a studio apartment with a male friend and works as an exotic dancer. She completed a parenting education program. Mother's most recent psychological progress report, in December 2013, noted that Mother is acutely paranoid and delusional; has schizoaffective disorder; and has also been diagnosed with bipolar disorder with psychotic features. At that point, Mother was refusing to take medications and did not complete her course of therapy due to missed appointments.

In regard to Mother's current status, Victoria adamantly denied that Mother has a history of mental problems, saying "she doesn't have one," and was merely pretending to be schizophrenic to qualify for disability benefits. Victoria still relies on Mother for transportation. Because Mother works at night, Victoria felt she could watch over the house while the children sleep. Victoria wants to live with Mother. She feels "this case is a waste of time . . . I don't feel like we're in danger at all."

V.G. (age four) told the interviewer that she lives with the M.'s "because they're my family." Asked who visits, V.G. replied, "That was [E.]" and denied that she has lived with E.L., adding, "I'm not living with [E.] because she's not my family and I don't want to live with her." In fact, she would "be really sad" if she lived with Mother instead of her family. Asked directly whether she wished to live with Mother, V.G. replied, "No, I don't want to because I want to live with my family."

For his part, O.L. (age two), said "[E.] is a girl." Asked whether he lives with E.L., he replied, "No, I live with my family," which he likes. He added, "I'm living with them because they're my family." He sees E.L. at monitored visits, and denied ever living with her. His "mommy and daddy" take care of him.

Mother's therapist indicated that Mother was unable to "think straight and understand things" while refusing medication, but is now a completely different and calmer person. However, Mother still "says the children are being cloned, she sees them everywhere" in the community, so her thinking process needs improvement. Mother only comes to therapy "when she wants to," which was not often while she was homeless. Mother does not understand that she would need money to feed the children and provide a babysitter, if she continues to work at night. The therapist felt that Mother would be better off with monitored visits. Unmonitored visits would be risky because "she still has delusions and sometimes acts on those," and could abscond with the children. Mother refused medication "all these years" because she felt the doctors were trying to poison her. More time is needed to see how Mother does, now that she is medicating. The therapist opined that while Mother strives to do well and regain custody, the children are "better off in the place they're at right now."

11

Mother's roommate feels she is much better, since starting medication. Before, "there was something off about her." Now, she can contain her emotions and is very good with the roommate's five-year-old son, and he leaves the boy in her care. The monitor for Mother's visits observed that she interacts well with the children, brings them healthy snacks, plays games and reads to them. They do not take instructions well from Mother, ignoring her or saying no, and she unsuccessfully tries to use guilt to induce compliance. The children do not have an emotional response when Mother fails to show up for visits or when she departs after a visit. They have "a vague notion of a relationship" and expect to spend small amounts of time with her, but "there's no affection." The children's social worker felt that Mother was fine with brief visits but could not care for them full time. Mother still thinks that having a place to live will automatically give her custody of the children. Victoria is parentified, directing Mother how to behave during visits and suggesting that Mother file a petition for modification.

Since entering foster care, V.G. made great progress. She and O.L. are happy and well-adjusted, displaying no behavioral or emotional issues. Mother received 18 months of services (from March 2012 to September 2013) but was noncompliant. She recently began a stable and medicated lifestyle. Nevertheless, she continues to have delusions and her prognosis is uncertain. Neither child views her as a parent, referring to her by her first name.

On June 12, 2014, the court heard Mother's modification request and conducted the section 366.26 hearing. Mother testified that she has used prescribed medication for four months, which helps her focus, feel happy, and stops her from yelling at strangers. She did not previously use medications during this case. Now she understands that the dependency system is beneficial, she can move forward, has a place to live, drives, works, and can safely care for the children. During visits, she and the children play, watch television, read, and eat. Mother resided with Victoria from her birth in 1996 until losing custody in 2000. She regained custody of Victoria in 2005, and feels that she did a wonderful job of childrearing. Mother believes that it would be better for the children to live with her because "I'm a good mom," they love each other, she needs them, and feels

12

that she can make them into smart, responsible adults. They are happy to see her and hug her. She receives therapy and plans to continue using medication.

On cross-examination, Mother stated that she has only had emotional difficulties for the last year and a half, and never had problems before that. She acknowledged that she is bipolar, with psychosis. She did not recall telling her therapist that she refused to take medication because it was going to poison her, although she recalled saying that the children are being cloned, terming it a "theory." Mother's attorney argued that she "is on a positive track with respect to getting her life together . . . [and] in time, her condition and her situation [are] going to improve even more." The children's attorney asked the court to deny a modification because circumstances are not changed, only changing. The children are bonded to their caretakers, where they have spent most of their lives. DCFS described Mother's condition as chronic and unresolved because she continues to be delusional, even with medication, and is inconsistent with therapy.

The court denied Mother's petition, because four months of medication "is not enough, when you consider the long, lifetime chronic problem that Mother has had with mental illness and her inability or lack of desire to treat it with medication. I have no reason to believe that she's going to stay on Abilify, even if it's working. And if she doesn't, I got two little children, a two- and four-year-old who are going to be in jeopardy." The court concluded that "the situation has not changed to the state where I would feel confident that Mother can keep these children safe." While Mother expressed her desire to have the children, there is no showing that she has the interests of the children at heart, and it is not in their best interest to live with Mother or be taken away from people who have raised them and whom they view as their parents. Mother has had ample opportunity to stay on medication, but refused to do so. The children deserve permanency and there is no reason to delay while Mother is given further opportunities.

After denying additional reunification services, the court terminated parental rights. The court acknowledged Mother's desire to parent and Victoria's desire to be the sibling, yet it is not in the children's best interest to sever bonds with the only caregivers they know and consider their mother and father. The children deserve permanency in a

13

household where they know who their parents are and are not subjected to drama from someone who refuses or forgets to take medication. With respect to Mother and Victoria, their visits "are not of such a nature and quality to say this bond is so strong that it should not be broken." Thus, no exception to the preference for adoption applies. The court found that the children are adoptable, are likely to be adopted by the M. family, and it would be detrimental to return them to the parents. Mother and Victoria appeal.

## DISCUSSION

### 1. Petition for Modification

When the court terminates reunification services, this "ordinarily constitutes a sufficient basis for terminating parental rights." (*In re K.C.* (2011) 52 Cal.4th 231, 236-237.) A parent may revive the reunification issue only by demonstrating changed circumstances. (§ 388; *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235; *Kimberly H. v. Superior Court* (2000) 83 Cal.App.4th 67, 72; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) There must be a genuine change in circumstances such that the child's best interests will be promoted by the proposed change in order. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250; *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1071.) To make this determination, the court may consider the entire factual and procedural history of the case. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258; *In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) The ruling cannot be reversed unless there is a clear abuse of discretion—an arbitrary, capricious or patently absurd determination that exceeds the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

### a. *Changed Circumstances*

Mother argues that she established changed circumstances by starting to use an antipsychotic drug, which regulates her moods and gives her better interactions with others, including the children. She regularly visits. The record supports Mother's argument that she has started treatment for her mental illness. But the record does not support a conclusion that circumstances have changed.

Mother previously participated in mental health counseling and was given prescriptions for antipsychotic drugs, without success. She repeatedly relapsed, convinced that she did not need treatment. During relapses, she displayed bizarre and frightening behavior during visits with the children. According to her testimony, she began taking medication in February 2014, five months after the court ended reunification services, when it became apparent that her parental rights would be terminated. She continues to have delusions, according to her therapist, and cannot be left alone with the children, lest she abscond with them. Mother is not currently able to provide the children with a stable, safe, permanent home. Without a showing of parental ability to provide a safe home, an 11th-hour attempt to extend the dependency proceeding is unavailing. (*In re A.S.*, *supra*, 180 Cal.App.4th at p. 358.)

Merely participating in counseling, medicating, and visiting the children are not proof of changed circumstances. (*In re Anthony W.*, *supra*, 87 Cal.App.4th at p. 251.) The juvenile court saw Mother's behavior and was not satisfied that the mental issues leading to the dependency proceeding have been resolved. At this stage, "changing" circumstances are not enough: the court need not delay the selection of a permanent plan to see if a parent who repeatedly failed to reunify with the child might be able to reform and reunify at some point in the future. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610; *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.)

b. *Best Interests of the Child*

In determining a child's best interest, the court considers (1) the seriousness of the reason for dependency jurisdiction; (2) the strength of the bonds between the child, the parent and the caretakers; and (3) whether the problems leading to dependency may be easily removed or ameliorated. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.)

Mother's history is highly relevant to any discussion of her parental fitness and the children's best interests. The record shows that Mother has resisted treatment for years. With multiple instances of psychosis and involuntary hospitalizations, Mother had a long way to go to prove parental fitness. She has not progressed to unmonitored visitation, let alone demonstrated an ability to take custody. For most of the proceeding, she was

15

homeless. The children showed no separation anxiety when visits with Mother were over, which tends to discount the strength of the maternal bond. On the contrary, they are anxious when separated from the home where they have spent most of their lives. The M.'s are their "mommy and daddy" and their "family." They refer to Mother as "[E.]" and either actively dislike visiting her or are indifferent and lack affection. On the eve of the permanent plan hearing, the children's interest in permanency and stability outweighs Mother's interest in reunification. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309; *In re Anthony W.*, *supra*, 87 Cal.App.4th at pp. 251-252.) The court properly denied Mother's petition for a modification.

## 2. **Termination of Parental Rights**

At the section 366.26 hearing, the court must select adoption as the permanent plan and terminate parental rights if the children are likely to be adopted.[3] (§ 366.26, subd. (c)(1); *In re Celine R.* (2003) 31 Cal.4th 45, 49; *In re S.B.* (2009) 46 Cal.4th 529, 532.) Adoption is the plan preferred by the Legislature. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826; *In re Ronell A.* (1995) 44 Cal.App.4th 1352, 1368.) Termination of parental rights can only be avoided by showing why a statutory exception applies, and that termination would be detrimental to the children. (*In re Celine R.* at p. 53; *In re Derek W.* at p. 826; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.)

### a. *Parent-Child Bond Exception*

The parent-child bond statutory exception requires a showing that Mother has "maintained regular visitation and contact" and there is a "compelling reason" to believe that ending the parental relationship would be detrimental to the children. (§ 366.26, subd. (c)(1)(B).) She bears the burden of proving that they would be "greatly" harmed by termination of parental rights, and that she holds a "parental" role. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853; *In re Angel B.* (2002) 97 Cal.App.4th 454, 466-468.)

Mother must show both prongs of the exception: regular visitation and a benefit to the child if the relationship were continued that outweighs the well-being the child would

---

[3]     Mother does not dispute that the children will be adopted.

gain in a new home with adoptive parents. As to the first prong, Mother failed to visit the children from March 1 to the end of November 2012, following their detention. A nine-month delay in visiting children who were (at detention) eight months and 20 months old is significant. At such a tender age, the children predictably bonded with the people who provided them with full-time nurturing. When Mother began visiting at the end of 2012, the children already referred to the M.'s as "mommy" and "daddy." They persisted in considering the M.'s to be their parents and family throughout this case.

As to the second prong, the juvenile court determined that the children's relationship with Mother is not so significant that they would be greatly harmed if it were severed. Mother does not attempt to argue in her brief that termination of parental rights will harm the children. Instead, she focuses on their pleasant visits.

The court's determination is supported by substantial evidence. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The children's detention began when O.L. was an infant and V.G. was one and a half, when Mother was involuntarily hospitalized for being a danger to herself or others and gravely disabled. She had multiple prior psychiatric hospitalizations. Mother exposed the children to bizarre and erratic behavior, and an unstable home in which she left the children without proper care for extended periods. She did not treat her mental illness because she denied having one. Mother did not visit the children for nine months after they were detained. While visits initially went well, Mother became agitated and verbally aggressive by August 2013, making outrageous accusations against DCFS staff members, upsetting the children and causing her visits to be prematurely terminated. Mother's behavior during monitored visits affected the children's emotional well-being.

As a result of Mother's history of psychotic behavior and unexplained disappearances, she was unable to have unmonitored, weekend or extended visits, let alone custody of the children. Mother's therapist felt that unmonitored visits would be risky because "she still has delusions" and could abscond with the children. A showing that a child would be greatly harmed by termination of parental rights is difficult to make when, as here, "the parents have . . . [not] advanced beyond supervised visitation." (*In re*

17

*Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) A true parental relationship would not require a third party to monitor parent-child visits.

Mother argues that she consistently visited, and the visits were positive and appropriate. Even frequent and loving contact between parent and child is not sufficient to establish the requisite benefit to the child if Mother does not occupy a parental role and is unable to take custody. (*In re Teneka W.* (1995) 37 Cal.App.4th 721, 728; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109.) Mother's brief fails to note evidence that her visits had a negative impact on the children, who wanted to remain at the foster home, or near the foster mother, instead of being with Mother. Mother's outbursts caused V.G. to scream and cry, and have uncontrollable tantrums for a week. Both children bluntly stated that they do not want to live with Mother, and she is not family to them. The foster parents are "mommy" and "daddy" and neither V.G. nor O.L. see Mother as a parent.

The children are fully bonded with their prospective adoptive parents. They see Mother as "[E]," who brings them snacks, reads to them, and watches television or plays games with them. A relationship that is "pleasant" is not enough to establish a benefit to the child because "it bears no resemblance to the sort of consistent, daily nurturing that marks a parental relationship." (*In re Derek W.*, *supra*, 73 Cal.App.4th at p. 827.) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Apart from the incidental benefit of parent-child interaction, we must consider "the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) Both children deny ever living with Mother. They have no recollection of her as a parent because they were so young when removed from her care. They only know Mother from visits that began nine months after detention. They

resisted seeing her after she had psychotic events during visits in 2013. Mother does not occupy a parental role for her children, and they frankly do not want to live with her.

Mother does not dispute that the children are thriving in their placement. She did not carry her burden of showing that the children would be greatly harmed by the termination of her parental rights, or that the benefits of continuing their relationship outweigh the benefits of a stable, permanent home. The juvenile court could reasonably find that Mother's relationship is not beneficial. In a guardianship or continued foster care, the children would have an unstable placement. It would be not be in the children's best interests—indeed, it would be cruel—to take the children away from the M.'s, people they describe as "family." Where, as here, a child is likely to be adopted, the court must choose "the most permanent and secure alternative that can be afforded." (*In re Beatrice M.*, *supra*, 29 Cal.App.4th at p. 1419.)

### b. *Sibling Relationship Exception*

Mother and Victoria argue that adoption by the M.'s creates a risk that V.G. and O.L. will lose contact with Victoria. They assert that the legislative preference for adoption does not apply in this case because "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

The sibling relationship exception presents a two-step process. First, the court determines whether terminating parental rights would substantially interfere with the sibling relationship, considering the nature and extent of the relationship, whether the children were raised together, and significant common experiences or existing close and strong bonds. Second, if terminating parental rights would substantially interfere with the sibling relationship, the court must weigh the child's best interest in continuing the relationship against the benefits the child would enjoy in a permanent adoptive home.

19

(*In re Celine R.*, *supra*, 31 Cal.4th at p. 61; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951-952; *In re Hector A.* (2005) 125 Cal.App.4th 783, 794.) The party opposing adoption bears a "heavy burden" of proving the exception. (*In re Celine R.*, at p. 61.)

        1.  Interference with the Sibling Relationship

The evidence shows that O.L. spent his first eight months and V.G. spent her first 20 months residing with Victoria. The siblings had significantly different experiences, due to the 14- to 15-year age gap between them. Victoria's experience was that of a babysitter, changing diapers and feeding her siblings in Mother's absences. O.L. and V.G. are too young to recall ever living in Mother's home. Once removed from Mother's care, the siblings lived together for one month before Victoria was removed when the foster mother found drug paraphernalia.

Victoria exercised poor judgment in foster care, disappearing for months, inviting men into her room, and having unauthorized visits with Mother. For much of this proceeding, Victoria was AWOL from foster care, living in Nevada, living with Mother, or tending to a newborn. During those periods, she did not visit O.L. and V.G.

Victoria has no insight into Mother's mental illness, and tends to ignore or minimize it, going so far as to say that Mother only pretends to be mentally ill to qualify for benefits. She characterized this proceeding as "a waste of time." Multiple caregivers asked for Victoria to be removed from their homes. She was a bad influence on other foster children. Victoria became pregnant at 16, abandoned her baby at a foster home, used drugs while breastfeeding, and was arrested for tagging graffiti in the presence of her child, who was detained. Victoria was intoxicated at the time of arrest. Given Victoria's attitude and behavior, it is doubtful that her relationship with O.L. and V.G. is beneficial. Even if she acts appropriately during monitored visits, Victoria is not a role model for her impressionable young siblings.

20

The evidence does not suggest that reduced sibling interaction would be detrimental to O.L. and V.G.[4] They apparently coped well when Victoria was removed from their communal foster home. There was no evidence presented that the children "other than being sad, would suffer detriment if the [sibling] relationship ended." (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 952.) Moreover, the M. family signed a contract indicating that they are willing to allow sibling visits.[5] The willingness of the prospective adoptive family to facilitate sibling visits is a factor demonstrating that there will not be a substantial interference with the sibling relationship. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 254.)

It bears emphasizing that Victoria is an adult, whereas O.L. and V.G. are young children. They will likely spend less time together as Victoria cares for her daughter Eli, works, or goes to school, regardless of whether her siblings are adopted or remain in foster care.

### 2. The Children's Best Interests

O.L. and V.G. have lived with the M.'s nearly all of their lives, are closely bonded to them, and want to continue living with their "mommy" and "daddy," whom they recognize as family. They would have stability and permanency if adopted by the M. family. "[A]s children age, they become more difficult to place for adoption." (*In re Megan S.*, *supra*, 104 Cal.App.4th at p. 253.) The juvenile court could reasonably conclude that O.L. and V.G. deserve familial permanency, instead of being "within the dependency system in perpetuity." (*Id*. at p. 254.)

Even if adoption would interfere to some extent with the sibling relationship, the juvenile court was well within its discretion to determine that the benefit to O.L. and

---

[4] Our analysis is limited to the possible impact upon the children being adopted. We do not consider any detriment to Victoria because the focus is on the best interests of the adoptive child, not the child's siblings. (*In re Celine R.*, *supra*, 31 Cal.4th at pp. 54-55; *In re Naomi P.* (2005) 132 Cal.App.4th 808, 822.)

[5] With the consent of the M. family, the court may include in any final order provisions for postadoption sibling contact. (§ 366.29, subd. (a).)

V.G. of a permanent home outweighs the importance of the sibling relationship. While the siblings in this case enjoy their visits, they are not emotionally dependent upon one another. Victoria's pleasant visits are not significant enough to militate against adoption. Neither Mother nor Victoria carried her burden of showing that adoption would be detrimental to O.L. and V.G.

## **DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

BOREN, P.J.

We concur:

CHAVEZ, J.

HOFFSTADT, J.